UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In re:

|  |  |
|---|---|
| AMERICAN RESOURCE & ENERGY, LLC, | ORDER DETERMINING ELIGIBILITY OF PETITIONERS IN INVOLUNTARY BANKRUPTCY CASE, AND DISMISSING CASE |
| Putative Debtor. | |
| | BKY 14-30262 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

At St. Paul, Minnesota
July 15, 2014.

This case was commenced on January 24, 2014 by the filing of an involuntary petition for relief under Chapter 7. Three named parties asserted the status of petitioning creditors: Qingdao ARE Wind Power Equipment Co., Ltd. ("QD Trading"[1]); Bestee Resources Holdings, Limited ("Bestee Resources"); and Charles Johnson. Joseph W. Dicker represents these parties. They will be identified collectively as "the Petitioners."[2]

The putative debtor, American Resource & Energy, LLC ("ARE"), is a St. Paul-based business concern. It filed an answer on February 21, 2014. It is represented by Marc M. Berg.

In its answer, ARE asserted, *inter alia*:

> 3. One or all of the Petitioners are ineligible to join in the Involuntary Petition against ARE.

---

[1] The wording of the abbreviated reference for this party will be explained later. *See* pp. 4-5, *infra*.

[2] At this stage in a contested involuntary bankruptcy case, the commencing parties are usually termed "petitioning creditors." However, in this case the putative debtor denies it is even liable monetarily to the commencing parties. Its active assertion of that denial in a non-bankruptcy legal forum is a key part of its defense to the petition. Thus it feels more appropriate to use a shorthand reference that is limited to these parties' early *function* in this case rather than a possible (but not yet established) *status* in an ongoing bankruptcy process. (And this despite the fact that the definitional matrix of 11 U.S.C. §§ 101(10)(A), (5), and (12) might otherwise enable them to be identified as "creditors," even at this early stage.)

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *07/15/2014*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

4.  None of the claims referenced in Attachment 1 to the Involuntary Petition have become due.

5.  As a result of some or all of the claims referenced in Attachment 1 of the Involuntary Petition being subject to a bona fide dispute, Petitioners have not met the requirements of 11 U.S.C. § 303 (b)(1).[3]

This pleading posed a threshold issue:  whether the Petitioners' claims were "not contingent as to liability or the subject of a bona fide dispute as to liability or amount," as 11 U.S.C. § 303(b)(1) requires of petitioning creditors in an involuntary case.  ARE disputes whether the petition was even properly brought, by these Petitioners.

A status conference was ordered, to address the posture of the case.  By the end of the conference, it was clear that the threshold issue of the Petitioners' status under § 303(b)(1) was best-addressed early, as a matter of law to be presented on cross-motions for partial summary judgment.  The parties were directed to take specific steps for that presentation.

The motions came before the court for hearing on May 6, 2014.  The Petitioners and ARE appeared by their counsel of record.  The following order disposes of the cross-motions for summary judgment on the threshold issue.  It also disposes of the petition and this case.[4]

---

[3]These paragraphs are verbatim quotes of these paragraphs, on pp. 1-2 of the answer [Dkt. No. 5].

[4]For the record: The issue on an involuntary petition under 11 U.S.C. § 303(a) that is contested pursuant to 11 U.S.C. § 303(h) is whether relief under the Bankruptcy Code should be ordered as to the debtor named in the petition.  The filing of an involuntary petition under Chapter 7 commences a case under the Bankruptcy Code (title 11 of the United States Code).  11 U.S.C.§ 303(b).  That case is within the district court's jurisdiction, 28 U.S.C. § 1334(a); the contested petition is a "civil proceeding under title 11" within the district court's jurisdiction, 28 U.S.C.§ 1334(b); as such it is before a bankruptcy judge by reference from the district court, 28 U.S.C.§ 157(a) and Loc. R. Bankr. P. (D. Minn.) 1070-1.  As a fundamental "proceeding affecting . . . the adjustment of the debtor-creditor relationship," a contested involuntary petition is subject to the entry of final order at the direction of a bankruptcy judge.  28 U.S.C. § 157(b)(2)(O).  An order for relief on a contested involuntary petition is a final order.  *In re McGinnis,* 296 F.3d 730, 731 (8th Cir. 2002); *In re Young*, 336 B.R. 775, 777 (B.A.P. 8th Cir. 2006).  By the same reasoning, the converse outcome--an order *denying* bankruptcy relief on an involuntary petition--is equally final, because "it is a final adjudication of the debtor's . . . status" that *declines* to "subject[ ] the debtor's assets to involuntary liquidation."  *See In re McGinnis*, 296 F.3d at 731.  Lastly, an order dismissing a bankruptcy case is a final order.  *In re Groves*, 39 F.3d 212, 214 (8th Cir. 1994).

## BACKDROP

Certain foundational facts have not been contested.  They go to the parties' structural and transactional relationships.  Many of the structurally-oriented facts are established by uncontroverted statements in individuals' affidavits, particularly from ARE's side.

It is not contested that sharp disputes arose out of the parties' relationships and are still unresolved.  Lawsuits on two such disputes were pending in the Minnesota state courts when the Petitioners commenced this case.  The parties' positions on the substantive aspects of those lawsuits are set forth in the pleadings they filed there.  The procedural status of the litigation is evidenced by the extant pleadings and (as to one of the lawsuits) the public record.[5]

This platform of uncontested fact is the starting point for the present analysis.  The uncontested facts include the following.[6]

ARE is a business entity organized under Minnesota law.[7]  Dion Johnson is a principal in ARE.  He had the status of its chief executive officer when this case was commenced.  Affidavit of Dion Johnson [Dkt. No. 20], ¶¶ 1, 3.

---

[5]These observations are made in mind of the current posture of this matter, on cross-motions for summary judgment.  Rule 56(a) requires that "there [be] no genuine dispute of any material fact" before such a motion may be considered on its legal dimension.  (Pursuant to Fed. R. Bankr. P. 9014(c), Fed. R. Civ. P. 56 applies to proceedings in bankruptcy cases.)  The novel thing about this case is that it presents a dispute over the existence of a separate dispute.  The dispute over the dispute is governed by bankruptcy law.  The underlying dispute goes to the parties' rights and liabilities under non-bankruptcy law.  The existence of an underlying dispute and its characterization under bankruptcy law are a matter of fact, but this is to be determined under an objective standard.  *See* pp. 17-18, *infra*.  Thus, objective manifestations of the parties' contentions with each other outside of bankruptcy bear on the existence and character of that dispute; and both pleadings and extrajudicial declarations of position can be consulted for the fact-finding required.

[6]Where specific factual aspects of structure or transaction are actively in dispute in the non-bankruptcy litigation and are relevant to the understanding of the issues at bar, they will be identified as "alleged" or "asserted" by ARE or by the Petitioners singly or collectively.

[7]QD Trading has admitted ARE's current status as a Minnesota limited liability company.  ARE has alleged, without controversy, that it was incorporated in Minnesota in 2009 and changed form to an LLC in 2010.

ARE was formed to function in a newer sector of the energy industry, electricity generation from wind power.[8] ARE's contemplated business was the design and sale of wind turbine towers, foundations, and raising systems. *Id.*, ¶ 3. The manufacture of this equipment, however, was to be done overseas. ARE transacted with persons and entities in the People's Republic of China for the fabrication; ARE designed the product and later sold it in markets outside China. The China-based parties to these transactions included two of the Petitioners, plus individuals associated with them.

ARE obtained an early entree to the business sector in China from Huang, Xiaohua,[9] a Chinese businessman. *Id.*, ¶ 4. In connection with that, ARE alleges the following: Xiaohua[10] proposed to form a corporation in China for use as a transactional intermediary in the chain of provision to ARE. He offered this as a means to obtain rebates of the Value Added Tax that the Chinese government would otherwise impose on products manufactured there for export. *Id.*, ¶ 5. Toward that, an entity was organized in 2009 under the original name of ARE Qingdao Wind Tower & Engineering ("QD Engineering," to distinguish this entity from Petitioner QD Trading). *Id.*, ¶ 6. Dion Johnson was "named as the sole investor" in QD Engineering. However, the entity's "listed total investment of $549,990.00 . . . came as an investment from" elsewhere. It is alleged to have come "from Xiaohua." *Id.*, ¶ 7. Dion Johnson considers himself, "at all times, [to have] been the

---

[8]Within the United States, Minnesota was an early leader in the development of this industry. *E.g.*, "Wind Energy Facts: Minnesota," www.mn.gov/deed/images/Wind_Turbines_Statewide.pdf [consulted July 15, 2014] (stating "Minnesota ranks fourth nationally for most installed wind capacity and added the fifth most new capacity in 2010," and "Minnesota ranked 3rd in the US in 2010 for percentage of electricity derived from wind").

[9]In traditional Chinese notation, the surname of a person appears first and the given name second. ARE's counsel used the orthographic convention of separating the surname from the given name with a comma, which is used here for consistency.

[10]In their written submissions, the parties made repeat-references to individuals with traditional Chinese names by using their given names rather than family-derived surnames. To avoid confusion (at least three of the Chinese individuals involved are related through family and two of them bear the same surname), the parties' form of reference is used here.

sole owner of QD Engineering." *Id.*, ¶ 9.

Then, in 2010, QD Trading was established to be the contemplated intermediary, on the advice that QD Engineering would not qualify to receive VAT rebates. QD Trading was formed as a joint venture. *Id.*, ¶ 10. QD Engineering was still to be involved as an entity-participant in the enterprise, by serving as the "foreign investment partner" in the newly-formed QD Trading. *Id.*, ¶ 10. A Chinese individual, Pan, Wei-Wei, was named as the Chinese "domestic joint venture partner" and major investor in QD Trading. *Id.* After that, Dion Johnson considered himself to have the "capacity as a shareholder of QD Trading (through [his] ownership of QD Engineering) . . . ." *Id.*, ¶ 13. At all times, he "understood that ARE . . . , QD Engineering, and QD Trading were operating as one entity." *Id.*, ¶ 12.

After that, ARE was provided with wind-power equipment manufactured by third parties in China, through the QD-associated entity-structure created in China. Affidavit of Dion Johnson [Dkt. No. 20], ¶ 11. QD Engineering played some active role in these operations. *Id.*, ¶ 12. An entity called Valmont Industries (China) Ltd. prominently featured among ARE's "significant suppliers," i.e., manufacturers. It is alleged that Huang, Xiao Yong, Xiaohua's brother, was the president and general manager of Valmont China. Affidavit of Dion Johnson [Dkt. No. 20], ¶ 5.[11]

Between late 2010 and mid-2012, the interactions among the various business entities (American and Chinese) and these and other individuals (American and Chinese) got very complicated. Soon things got highly confrontational. The historical details are quite involved. There is at least some controversy among the participants as to whether particular events occurred as respectively alleged.

---

[11]Dion Johnson also terms Xiao Yong "a friend of mine"; or at least he was when QD Engineering was formed. *Id.*

The underlying phenomenon is utterly clear, though: a struggle arose and quickly mounted, for dominance over the entire ARE-related enterprise. The subjects of dispute and the objects of this contest went across the board: the facial and actual capitalization for QD Engineering and QD Trading; the nominal structure and the contrary understandings for the operational and de jure control of both of those entities; and ultimately the ownership and control of ARE as the U.S.-sited end-node of the enterprise.[12]

This turmoil led to the commencement of two actions at law against ARE in the Minnesota State District Court for the Second Judicial District, Ramsey County. A third lawsuit was brought against Dion Johnson individually. Two of the Petitioners in this bankruptcy case are ARE's opponents in the first two lawsuits. Their actions were pending when the Petitioners filed an involuntary bankruptcy petition against their opponent in litigation.

In very broad-brush, the nature of the actions against ARE and their procedural posture as of January 24, 2014 is as follows:

1.  *Qingdao ARE Wind Power Equipment Co., LTD v. American Resource & Energy, LLC and Dion Johnson*:

- This lawsuit was commenced by the service of a complaint dated November 11, 2013. The complaint was subscribed by Joseph W. Dicker as counsel for the named plaintiff, QD Trading. In its complaint, QD Trading sought separate awards of damages against ARE and Dion Johnson on different substantive theories. Against ARE, the theory was breach of contract (on allegations of failure to pay for invoiced shipments of goods). Against Dion Johnson, the theory was breach of fiduciary duty (on allegations that he was using ARE's revenues to preferentially pay

---

[12]This led to a certain amount of *ad hominem* rhetoric from counsel in this case. The histrionics included the accusation from the Petitioners' counsel that ARE was irresponsibly advancing an unfounded theory of malign "vast conspiracy" among the Chinese participants, against Dion Johnson. These motions were no place to indulge in such diversions. After all, the record suggested that there was a kernel inside: the fact that someone in the Xiaohua/Xiao Yong alignment was indeed attempting a hostile takeover of ARE in 2013. Of that, more, *infra*, p. 7-8.

6

other creditors to which he had personally guaranteed payment from ARE, to the detriment of QD Trading on its unpaid invoices).

• In their answer, ARE and Dion Johnson denied that ARE was in actionable breach of any contract with QD Trading. They asserted affirmative defenses sounding in equity and law, in conclusory fashion. In a counterclaim, ARE and Dion Johnson sued QD Trading for damages under the theory of unjust enrichment. The counterclaim was based on joint allegations that QD Trading had reneged on various covenants and commitments for the ownership, control, and economic value of QD Engineering[13] and QD Trading.[14] They complained that Valmont China, as a manufacturer for ARE, had revoked a $500,000.00 line of credit previously given directly to ARE, rendering ARE "unable to operate," and had transferred the line to QD Trading. The theory for damages was that QD Trading had usurped the value of VAT rebates actually paid, despite having no defensible claim to them--because ARE and Dion Johnson had funded all of the expenses of product and business development in the ARE enterprise and QD Trading "made no contribution to product and business development."

• In another key feature of the counterclaim, ARE and Dion Johnson asserted that Xiaohua, through the instrumentality of his company QD Bestee Industrial Company and the agency of his wife Liu Yu, was wrongfully claiming that Liu Yu had become the majority shareholder-owner of ARE through the wrongful exercise of stock warrants ARE had issued in 2010. In connection with that, ARE and Dion Johnson noted that litigation had been commenced in the Ramsey County District Court in October, 2013 by Liu Yu

---

[13]There termed "ARE Engineering."

[14]There termed "ARE Qingdao."

7

against Dion Johnson and his wife Stacey, and that the respective sides to that lawsuit were each claiming to be the majority shareholder of ARE.[15]

- In a reply, QD Trading used a grab-bag of denials to dispute that it had engaged in wrongdoing and inequitable conduct. QD Trading asserted that ARE and Dion Johnson were not entitled to any equitable relief on an unjust-enrichment theory. It denied that it had received any undue benefit from VAT avoidance because "that benefit was passed on to ARE . . . in reduced pricing." More generally, QD Trading pled that all of its own actions had been justified under contract and law; that ARE and Dion Johnson "were instrumental in structuring the business relationship of the parties"; and that "it would be inequitable for the state court to allow the disavowal of the parties' contracts only when those contractual relations prove inconvenient."

*See* Complaint, Q*ingdao ARE Wind Power Eqt. Co., LTD v. American Resource & Energy, LLC and Dion Johnson* (Ramsey County, Minnesota District Court, *unfiled*[16]), ¶¶ 128-135 (breach of contract, against ARE), 136-143 (anticipatory breach of contract, against ARE), and 144-150 (breach of fiduciary duty, against Dion Johnson); Joint Answer and Counterclaim (same lawsuit), ¶¶ 3 (denial of breach and anticipatory breach), 14-16 (equitable defenses), 13-17 (manager of QD Engineering was purporting to act as general manager of QD Trading and had purported to authorize that lawsuit, despite Dion Johnson's book-status as "100% owner" of QD Engineering), 39-43 (QD Trading wrongfully retaining value of VAT rebates), and 35-37 (pending shareholder-control litigation over ARE, between Dion Johnson and Liu Yu); Reply to Counterclaim (same lawsuit), ¶ 31

---

[15]This is the third pending lawsuit mentioned on p. 6.

[16]Under the procedure in the Minnesota state courts, a civil action is commenced on service of the summons or on designated equivalents of such service. Minn. R. Civ. P. 3.01. A civil action that is not subject to family-court jurisdiction may be maintained on an unfiled complaint for up to one year after commencement. Minn. R. Civ. P. 5.04. Absent a stipulated extension an action on an unfiled complaint is "deemed dismissed with prejudice against all parties," after the end of that period. *Id.*

and ¶ 2 of "Statement of Affirmative Defenses."[17]  *See also* Affidavit of Robin Tooker [Dkt. No. 21],

¶ 7 (asserting that "aggressive actions taken by" Xiaohua and others, "which effectively cut off QD

Trading as a conduit between ARE LLC and its manufacturers in China," prevent ARE "from fulfilling

orders and collecting from customers," disrupting revenues and leading to default on payment on

invoices).[18]

The QD Trading-ARE action was pending and wholly unresolved when the

Petitioners (including QD Trading) filed the involuntary petition for this bankruptcy case.

2. *Charles Johnson v. American Resource & Energy/Dion Johnson*:

- This lawsuit was commenced in 2013 in the Conciliation Court for the Second Judicial District, Ramsey County. The plaintiff alleged that he had been engaged by ARE as a sales person in 2012. He sued on allegations that ARE owed him unpaid commissions earned during his engagement with ARE or with ARE Sales & Engineering, a related company. He asserted that ARE was liable for the compensation regardless of the company for which he obtained the sales, because Dion Johnson had assured him ARE would pay him when he shifted his contractual relationship to the other company.

- The defendants contested Charles Johnson's claims. Both sides appeared before a conciliation court referee. Charles Johnson received an award of damages in the amount of $10,000.00 plus $80.00 in fees. Judgment was entered against both defendants on January 15, 2014.

---

[17]These pleadings are in the record as attachments to a stipulation among the parties [Dkt. No. 16]. Henceforth, they will be denoted "*QD Trading/ARE* Complaint," "*QD Trading/ARE* Answer," and "*QD Trading/ARE* Reply."

[18]Tooker identifies him/herself as ARE's chief financial officer. *Id.*, ¶ 1.

- After that, the defendants timely removed Charles Johnson's action to the Ramsey County District Court.  The action was still pending there when Charles Johnson and the other Petitioners filed in this court.

The third original Petitioning Creditor in this case was identified as "Bestee Resources Holdings Limited" on the face of the original petition [Dkt. No. 1], with a claim of $550,000.00 attributed to it.  The petition characterizes Bestee Resources' claim as "Business Loan."  (This specific entity as a Petitioner has already been assigned "Bestee Resources" as its reference for this discussion.)

When the petition was filed, no litigation was pending between Bestee Resources and ARE in any jurisdiction.  In submissions for the motions at bar, the parties made various statements about this Petitioner and its relationship with ARE:

- Xiaohua provided an infusion of around $550,000.00 on the formation of QD Engineering in 2009.  Affidavit of Dion Johnson [Dkt. No. 20], ¶ 7.  ARE claims to possess records that reflect a series of transfers of these funds:  the money was generated "through another company that [Xiaohua] owns, Qingdao Industrial Bestee Company"; it was then channeled into ARE by wire transfer from "another company East Sailing International"; it was then wired by ARE on to QD Engineering; and nearly all of the funds ($499,000.00) were then wired by QD Engineering (back) to Qingdao Industrial Bestee Company, the money's originator. Affidavit of Robin Tooker [Dkt. No. 21], ¶ 3.

- The Petitioners and ARE all admit that no documents were executed to memorialize the nature of the payment made to ARE, or the nature of the payment on on to QD Engineering. ARE asserts that "[t]his money is treated as a loan to Qingdao Industrial [Bestee Company] on QD Engineering's books," as to the very last transfer. *Id.*

10

•  Bestee Resources now asserts that the transfer of $550,000.00 into ARE is the basis of its claim as a creditor of ARE.  The theory is that "[n]onetheless, the parties intended that the transaction would be a loan," at the inception of the transaction.  This assertion is made only in legal argument.  Petitioning Creditors' Notice of Hearing and Motion for Partial Summary Judgment [Dkt. No. 17], 14. The Petitioners have not filed any declaration to bear out this characterization by offer of proof--no affidavit by any individual associated with any of the Petitioners, no evidentiary material of any sort.[19]

•  The record contains nothing to resolve the confusion between the variant references to possible entity-participants bearing the word "Bestee" in their names.   The two entity names are distinctive in wording; however, it is not clear whether the entities themselves are distinct, i.e., separate.  There is nothing to evidence a transfer of rights from a "Qingdao Industrial Bestee Company" to Bestee Resources, the named Petitioner in this case. On this basis, ARE challenges Bestee Resources' standing to assert a creditor status premised on the $550,000.00 transaction, whatever its nature.   ARE's Supporting Memorandum [Dkt. No. 18], 4.

•  The Petitioners insist that "Bestee is not a shareholder of [ARE]."  Petitioning Creditors' Notice of Hearing and Motion for Partial Summary Judgment [Dkt. No. 17], ¶ 15. They maintain that "on numerous occasions [ARE] acknowledged that it had a debt owed to Bestee that it had to repay," and that ARE committed in writing "to repay the amounts owed Bestee."  They cite an entry for a "debt owed to Bestee" on ARE's own internal balance sheet, as one such written acknowledgment.  *Id.*, ¶¶ 16-18.  (These,

---

[19]The original petition [Dkt. No. 1] was not even verified by or for any of the Petitioners.  An "Amended Petition" filed later in this case--*see* p. 31 *infra*--appended a summary verification-by-declaration on behalf of Bestee Resources, bearing a signature of one Zhen Li who asserted the status of "Assistant to President."  At most, that served only to verify the Amended Petition's reprised assertion of "Business Loan" as the nature of its claim.

again, are only statements made in an unverified motion document, unsupported by affidavit, declaration, or appended exhibit.)

• ARE maintains that the $550,000.00 infusion on QD Engineering's formation "came as an investment from Xiaohua, and it was always represented to [Dion Johnson] that this was Xiaohua's intent." Affidavit of Dion Johnson [Dkt. No. 20], ¶ 7. Dion Johnson asserts that he relied to his personal detriment on these alleged representations by Xiaohua; he complains that he "never would have let Xiaohua, Xiao Yong and/or anyone else working on their behalf . . . to lead me down this path that has brought ARE LLC into the present series of litigations." Somewhat ambiguously, Dion Johnson admits by the same token that "QD Engineering was organized with [himself] *named* as the sole investor . . . ." (emphasis added). *Id.*

• Nearly three years after the fact of the $550,000.00 infusion, Dion Johnson professed (to Xiaohua) that he had no knowledge about the source of the money and the legal characterization of the infusion (i.e., loan or investment). He asked for clarification from Xiaohua. The responses from Xiaohua were terse, vague, and evasive. Exh. 1 to Affidavit of Dion Johnson [Dkt. No. 20] (e-mail exchange).

## ANALYSIS

### Introduction

Under United States law, an individual or corporate debtor may be put into bankruptcy by the petition of creditors. To qualify to file or to join an involuntary petition, a creditor must hold a claim against the putative debtor that is "not contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1). Colloquially speaking, this requires a certain level of solidity in a creditor's claim, something akin to a coherent and well-based case for a right to payment enforceable under non-bankruptcy law, before the creditor may seek

12

the powerful, collective remedy of bankruptcy against its debtor.  But if there is a contest over a

putative debtor's liability that is worthy of a fight under generally-applicable law, whether going to

law or fact, the putative debtor may not be forced into the collective process of bankruptcy at the

instance of the holder of such a contested claim.  The putative debtor is entitled to its day in court

first, through trial or other adjudication on the merits under the non-bankruptcy legal process.  Only

if it loses there, can its claimant qualify as a petitioner in bankruptcy against it.  *In re Busick*, 831

F.2d 745, 749 (7th Cir. 1987).

It has been observed that "[l]imiting qualifying claims to those not subject to bona

fide dispute was an attempt to balance the interests of debtors and creditors in involuntary cases."

2 Collier on Bankruptcy ¶¶ 303.11[1] (16th ed. 2013).  More precisely, perhaps, the requirement

reflects Congress's dual recognition:  potential liquidation in bankruptcy[20] is a game-stopper for the

normal, sequential dispute resolution process of litigation; and because the remedy of involuntary

bankruptcy is vulnerable to overreaching, it implicates more basic concerns of fundamental fairness

and the balance within federalism.  Thus, the requirement grants the ability to trigger involuntary

bankruptcy only to parties whose grievances against the debtor have a preponderate degree of

firmness under non-bankruptcy law.[21]

_____

[20]Or a forced reorganization under Chapter 11.

[21]Collier points to one possible abuse toward which the limitation is aimed: "If creditors with clearly
disputed claims could initiate an involuntary filing, creditors could improperly use the involuntary process
(or threat of it) to extort either payment or at least favorable resolution of a bona fide dispute from a
debtor."  *Id.* (citing *In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007), *In re Tobacco Rd.
Assocs., LP*, 2007 U.S. Dist. LEXIS 22990 (E.D. Pa. Mar. 30, 2007), et al).  For some reason, this
commentary does not recognize the potential abuse that is much more consequential.  Injection into
bankruptcy imposes a moratorium on the continuance of litigation involving the debtor, via the automatic
stay of 11 U.S.C. § 362(a)(1).  The liquidation process under Chapter 7 then has two intermediate effects
on pending litigation.  Unless it implicates nondischargeability under 11 U.S.C. § 523(a), the creditor's suit
against the debtor is relegated to a claim against the estate which is to be fixed through the more
summary process of allowance in the bankruptcy case.  Any direct claim or counterclaim by the debtor
against the creditor vests in the bankruptcy estate, for administration by the trustee as an asset to the
extent it is not exempt.  The consequence of these two processes is that the debtor is deprived of nearly
all of the control it had in the pre-petition litigation.  In all but the rare case, litigation in the non-bankruptcy
forum is terminated.  The creditor is freed of significant burden and annoyance and is now subject to
relatively less cost, risk, and end-loss, particularly where the debtor made counterclaims against it.  This

Such an observation is more easily made than applied, however.  Legislatively

> trying to protect both creditors and debtors [as to the
> initiation of a bankruptcy process] always leads to an
> uneasy tension.  The meaning of "bona fide dispute
> as to liability or amount" is but one example of this
> tension.

*Id.*  This tension is not resolved in the statutory text: "The [Bankruptcy] Code does not define a 'bona fide dispute' and thereby leaves the term's meaning to judicial determination," i.e., to judicial construction.  *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991).  And however "bona fide dispute" is defined by construction, the determination on its existence relative to a petitioning creditor's claim must be made by the forum bankruptcy court.  For that determination, relevant factors include the posture of the parties; the nature and gravity of their contentions with each other, factual and legal; and the backdrop non-bankruptcy law that governs their dispute.

This sort of controversy showed right on the face of ARE's answer.  The issue was threshold in character:  ARE maintained that all three of the Petitioners' claims were subject to bona fide dispute as to liability and amount, with that dispute largely evidenced by the fact that two of the Petitioners' claims were in active litigation outside of bankruptcy.  As such, the issue was potentially case-dispositive.  Were all three Petitioners disqualified by the existence of such disputes, their petition would fail--for utter lack of statutorily-qualified proponents for bankruptcy relief against ARE.  Were at least one, but less than all, of the Petitioners disqualified, the immediate result would be not as decisive; but the determination would at least narrow and channel proceedings going forward.  This is why the parties were directed to put the threshold issue before the court early and

---

comes about because the party substituted into the controversy, the trustee, is motivated by considerations of economy in administration and generally seeks prompt closure.  This more distanced position carries a greater willingness to deal toward settlement.  That contrasts sharply with the position of a personally-motivated party-litigant with a dog directly in the fight.  Placing a bothersome litigation opponent into bankruptcy can be a powerful way to buy peace on difficult cross-running claims, at less expense.  As the precipitant for that, the involuntary petition has obvious potential for abuse.

by motion.[22]

At the status conference, that seemed to require only a summary process, given the record made in the recent formal litigation between ARE and two of the Petitioners. Rule 56, for summary judgment, seemed to be the appropriate vehicle--and that, again, because of the posture of ARE's controversies with all three Petitioners and the extrinsic, preexisting, formalized articulation of factual and legal positions for two of them.

### Vehicle for Determination; Scope of Record and Consideration

When the extant precedent is applied here, that initial conclusion requires some further nuance. *Rimell* categorizes the "determination as to whether a dispute is bona fide" as a factual finding. 946 F.2d at 1365. This does not mean that the determination cannot be made on summary judgment. However, the Eighth Circuit observed, ". . . the determination as to whether a dispute is bona fide will often depend . . . upon an assessment of witnesses' credibilities and other factual considerations . . . ." 946 F.2d at 1365.

Both sides probably had this thought when they envisioned a discovery process and the presentation of significant evidence on the issue of bona fide dispute.[23] But the Eighth Circuit's pronouncement is not categorical; *Rimell* uses the adverb "often," not "always" or "invariably." The relative certitude of *Rimell*'s observation probably springs from the context of that case: the petitioning creditors, all banks, had not sued the individual debtors on the personal guaranties of corporate debt that the banks were asserting as claims to qualify themselves as petitioners under § 303 against the individuals. There was no extrinsic, pre-petition articulation of factual and legal position in formalized pleading, to lay out points of dispute for evaluation on their face as bona fide

---

[22]At the status conference, both sides professed to need broader discovery. ARE's counsel advocated for a months-long period in which to conduct it. That did not seem at all warranted, particularly given the dictate that the "court . . . determine the issues of a contested petition at the earliest practicable time," Fed. R. Bankr. P. 1013(a). Thus the parties and counsel were not given that indulgence.

[23]At the status conference, counsel seemed surprised at the court's insistence on an early presentation via Rule 56.

or not.

For some reason, the bankruptcy court in *Rimell* took testimonial evidence of some substance, to evaluate the debtors' assertion of bona fide dispute on the ground of an oral modification of the obligation of payment under the written guaranties.[24]  946 F.2d at 1365.[25]  The bankruptcy court went all the way to a specific finding on whether the parties had actually "orally or through prior course of dealing, agree[d] to alter, extend or modify the existing written contractual terms . . . ."  946 F.2d at 1366.  *See also* 111 B.R. at 258-259.  Finding against the debtors on that actual point of fact, the bankruptcy court held that the banks' claims on the guaranties were not subject to bona fide dispute.  111 B.R. at 258.  The Eighth Circuit affirmed on the ground that the finding was not clearly erroneous.  *Id.*[26]

It is too easily said in hindsight, but perhaps the bankruptcy court could have avoided taking evidence.  The reported facts implicate the parol evidence rule or the statute of frauds.  Application of these authorities may have allowed a resolution of bona-fide status as a matter of law on a non-testimonial written record.  None of the three published opinions recognizes this possible avenue.

Three things are clear, however.  In light of them and on the state of current law, *Rimell* does not categorically *require* the taking of evidence on an assertion of bona fide dispute for the case at bar.

---

[24]This was the only dispute identified by the Eighth Circuit in its analysis of bona fide character. 946 F.2d at 1366.

[25]*See also In re Rimell*, 111 B.R. 250, 258-259 (Bankr. E.D. Mo. 1990) (trial court decision evaluating testimony received).

[26]On an intermediate level, the district court had affirmed.  *In re Rimell*, 121 B.R. 253 (E.D. Mo. 1990).

16

First, Fed. R. Bank. P. 1018 expressly makes Rule 56 applicable to proceedings in disposition of a contested involuntary petition, through the intermediate receptacle of Fed. R. Bankr. P. 7056.

Second, the Supreme Court's intervening adoption of a new standard for pleading requires more replete and pointed fact-pleading in complaints and answers. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 1960 (2007*); Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). Fed. R. Bankr. P. 1018 does not incorporate those standards for direct use because it does not make Rule 12(b)(6) expressly applicable to proceedings on contested involuntary petitions. Nonetheless, the bankruptcy court can well take a page from the "plausibility standard" imposed by *Twombly* and *Iqbal*, in divining the existence of bona fide disputes from the content of *extrinsic* pleadings in *preexisting* litigation between petitioning creditor and putative debtor, as a matter of fact under *Rimell*'s analysis. A pleading that is governed by the plausibility standard can be deemed a complete, best-shot statement on fact and law. If its averments are plausible they may be compared directly to the opposing pleading for the existence of bona fide disputes of fact or law.

And third, *Rimell* itself does not mandate an actual or advisory ruling on the merits of disputes. The court is only to "determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." 946 F.2d at 1365 (quoting *Matter of Busick*, 831 F.2d 745, 750 (7th Cir. 1987); citing also *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir. 1988)). The court "may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists." *Id.* (citing *Busick,* 831 F.2d at 750). But in the end,

> [t]he court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute.

*Id.*[27] (citing *Bartmann*, 853 F.2d at 1544).

*Rimell*'s articulation puts primacy on the legal viability of petitioning creditors' claims and putative debtors' defenses against them, under the facts advanced in support of them. Where such claims are already in suit under a plausibly-pled statement of facts, *Rimell* does not require the analysis on bona fide dispute to go to an actual resolution of the pleaded issues on their merits, or to any sort of determination close to that character.

Rather, a determination under § 303(b)(1) need go only to the *existence* of a dispute from the putative debtor as to its liability on the claim or the claim's amount, and then whether the debtor has an objective basis in *asserted* fact or law for its disputation. As to the factual dimension of resistance, this is satisfied when facts are pled or framed *plausibly* to support a defense. When it comes to the objective character of legal positions, it is satisfied where they are pled *colorably* against the petitioning creditor--in the sense of "having at least a prima facie [i.e., "at first sight"] aspect of justice or validity." Brian A. Garner, *Garner's Dictionary of Legal Usage* (3d ed. 2011), 175 (quoting definition from Oxford English Dictionary) and 707. The pleaded legal position is not put to the measure of *meritorious*, i.e., "meriting a legal victory, having legal worth," Brian A. Garner, ed., BLACK'S LAW DICTIONARY 1010 (8th ed. 2004). Imposing that standard would require a conclusive determination on the merits; and under *Rimell* that is not required.[28]

---

[27]Thus, the judicial task goes *toward* the merits of the parties' disputes, but it does not go right *to* them. This nuance is a further reflection of the tension within the statutory qualification for petitioning-creditor status.

[28]It bears noting that this articulation is different from that used in the chain of precedent, but it is still consistent with it. In *Rimell*, the Eighth Circuit relied heavily on other circuits' considerations for the quality of a debtor's disputation. It adopted the requirement of an "objective basis" for dispute from the Seventh Circuit--*Busick*, 831 F.2d at 750--noting that it had also been adopted by the Tenth Circuit, *Bartmann v. Maverick Tube Corp.*, 853 F.2d at 1544. *Rimell* also cites with approval the Third Circuit's conception of "*substantial* questions" of law or fact being inherent in a bona fide dispute. *B.D.W. Assocs. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (1989). The Eighth Circuit also noted the predecessor-circuits' heavy reliance on the reasoning of an early bankruptcy court decision, *In re Lough*, 57 B.R. 993 (Bankr. E.D. Mich. 1986). Yes, the *Lough* court used the adjective "meritorious" for the sort of legal dispute that would qualify as bona fide, 57 B.R. at 997, and that specific word is rejected here as inconsistent with *Rimell*'s mandate to avoid reaching substantive merits. The *Lough* court underlines the same limitation in the ensuing breath: ". . . the Court must emphasize that in deciding whether there is a

So, the issue is now at bar on the two-stage analysis for summary judgment:

> *First*, is there a genuine dispute of material fact--i.e., a triable issue as to a fact necessary to satisfy an essential element of the claim or defense in question, under the governing law?
>
> *Second*, and only if there is no genuine dispute of material fact, does the governing law dictate judgment for the movant on the facts thus established as uncontroverted?

*In re Fields*, 449 B.R. 387, 391 (Bankr. D. Minn. 2011). *See also In re Senior Cottages of America, LLC*, 438 B.R. 414, 418 (Bankr. D. Minn. 2010).[29]

Unquestionably, ARE denies its liability on the claims of all three Petitioners. As obviously, it challenges the amount of any liability to any or all of the Petitioners.[30] There are *disputes* here. So, the issue goes to the statutory qualifier: is ARE's resistance to the claims *bona fide*, i.e., is there an objectively plausible and legally-colorable basis on which it contends it is not liable to the three Petitioners on the bases and to the extent the Petitioners assert?

Under the earlier discussion, that can be determined on the record at bar.

For two of the Petitioners, the status of their pre-petition litigation and the face of its pleading is sufficient to make out a bona fide dispute on their claims. The supplementary submissions made for this motion only strengthen that conclusion for both of them. For the third, Bestee Resources, the bona fides of ARE's dispute are clearly-evidenced in the record. The overlap between Bestee Resources' and ARE's assertions of fact and law is probably sufficient in itself to make out a bona fide, litigable controversy. In any event, the departure between them

---

bona fide dispute, it must not resolve any genuine issues of fact or law . . . ." *Id.* This indicates that *Lough*'s use of the modifier "meritorious" was more a matter of connotation than denotation.

[29]This formulation is distilled from the plain text of Rule 56 itself; the Supreme Court's analysis under the longstanding authority of *Celotex Corp. v. Catrett*, 477 U.S. 317 and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (both 1986); and the Eighth Circuit's application of the two Supreme Court opinions since their issuance.

[30]All three of the claims in question can be broken into component sub-debts.

certainly establishes one.  The claims of all three Petitioners lack the solidity, the prima facie sheen of enforceability and consequent recovery, that § 303(b)(1) requires to qualify as a petitioning creditor in involuntary bankruptcy.

### Analysis:  Petitioners' Claims

### 1.  QD Trading

The Petitioners' counsel maintains that the *QD Trading/ARE* Complaint pleads a straightforward action to collect on accounts receivable, framed under the theory of breach of contract and factually premised on ARE's failure to pay for invoiced shipments of goods.  He insists that the putative Debtor has not controverted any of QD Trading's fact-pleading for this legal theory.

In both of those propositions he is essentially correct on the factual plane.  ARE's pleaded denials do not dispute the basic transactional events of order, fulfillment, and billing, other than to correct the numbering of particular invoices for sales in the complaint's lengthy enumeration. Nor, really, does ARE deny its nonpayment in a transactional sense.

However, that does not make the resistance in the *QD Trading/ARE* Answer "completely without merit" on its face, as the Petitioners' counsel insisted at an earlier hearing.  In that answer, ARE denied that it was in actionable breach of any contract or contracts for supply. The *QD Trading/ARE* Answer does not expand with any specificity on the basis for this denial; but ARE does so in its submissions on these motions.  It alleges that QD Trading maliciously took multiple actions to interrupt the ongoing flow of client-purchaser business to ARE, and to break "the conduit for the purchase orders from ARE . . . to Valmont China," the manufacturer, that the whole ARE enterprise structure was based on and was to promote.  This, ARE argues, so hindered its operations that its performance (payment) on early orders was not possible.  Affidavit of Robin Tooker [Dkt. No. 21], ¶ 7.  ARE characterizes QD Trading's actions as a breach of the implied covenant of good faith and fair dealing, giving it the defense of excuse for its own nonperformance-via-default-in-payment.  ARE argues that these defenses, if successful, would either reduce or

entirely bar QD Trading's recovery in the state-court lawsuit.  It cites some local authority for these black-letter concepts in contract law: *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984); *Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Society*, 433 F.3d 637, 641 (8th Cir. 2006).

On its face, premised on the developed submissions for these motions, this argument is well-founded.

Under *Rimell*, QD Trading as a petitioner had the initial burden, to "establish a prima facie case that no bona fide dispute exists."  946 F.2d at 1365.  To meet this burden, QD Trading relied on ARE's concession: ARE did not deny its nonpayment on a string of specifically-identified invoices when it answered in *QD Trading/ARE*.

This, however, cannot meet the burden even standing alone.  The argument is premised on the content of the *QD Trading/ARE* Answer.  Though in summary form, ARE does deny in other parts of the same document that the nonpayment constituted an enforceable breach. This raises an issue of law, which is fleshed out by the supplementary fact averments in the record at bar.  ARE's fact allegations, set forth in plausible fashion, colorably support a defense of excuse for breach, to QD Trading's contractually-based claim.

The dispute, then, is evidenced by the fuller text of the very document on which QD Trading asserts a lack of dispute.  QD Trading is simply wrong in dismissing ARE's original resistance as "of course . . . without merit."[31]  Yes, ARE's "subjective intent [and its] subjective belief" alone are not sufficient to make out a bona fide dispute, *Rimell*, 946 F.2d at 1365; but in equal token neither is QD Trading's subjective, conclusory scorn for ARE's resistance.  The content of pre-petition pleadings and the current, expanded offers of proof and theory, are the measure on bona fides.

---

[31]The quotation is from remarks by the Petitioners' counsel at an earlier hearing.

QD Trading's claims on the accounts receivable are the sole basis for its asserted status as a petitioning creditor.  They clearly are subject to bona fide dispute.  At the very least the dispute goes to amount, in the sense of an excuse for nonpayment on invoices issued after the alleged disruption by QD Trading.  It may go to liability entirely.  ARE's factual assertions of frustration of performance and interference with contractual and customer relations raise defenses to QD Trading's claims that are both facially plausible and legally colorable.

One other observation is warranted.  While a separate, pleaded counterclaim does not necessarily qualify for a bona fide dispute under § 303(b)(1), 2 Collier on Bankruptcy ¶¶ 303.11[1] and 303.31[5] (16th ed. 2013), ARE's counterclaim for the conversion or usurpation of VAT rebates certainly cumulates with the direct defense to QD Trading's claims.  In a general, cumulative sense, it further undercuts the platform for QD Trading's qualification as petitioning creditor.

One final point:  ARE argues another impediment to suit in *QD Trading/ARE* that cannot be dismissed out of hand, and hence is raised in good faith.  ARE and Dion Johnson assert that QD Trading commenced suit against them without authority; that is to say, they deny that the initiation of *QD Trading/ARE* on behalf of the named plaintiff was directed by persons with legal authority to act for QD Trading and in accordance with entity governance.  They point out that QD Engineering was denominated as the foreign investment partner in QD Trading, and that Dion Johnson was the sole record owner of QD Engineering from its inception.  ARE's Supporting Memorandum [Dkt. No. 18], 4. Dion Johnson alleges that he believed throughout that he was the beneficial sole owner of QD Trading through his 100% stake in QD Engineering.  He argues that whether his beneficial interest was full or partial, QD Engineering still had to give its consent to QD Trading's commencement of litigation like *QD Trading/ARE*.  ARE's Supporting Memorandum [Dkt. No. 18], 15-16.

22

To opposite effect, the Petitioners assert that "Pan Weiwei . . . owns 2/3 of the ownership interest [in QD Trading] and QD Engineering owns 1/3." Petitioners' Notice of Hearing and Motion for Summary Judgment [Dkt. No. 17], 3. *See also* Petitioning Creditors' Memorandum [Part of Dkt. No. 17], 15. They also deny that Dion Johnson and ARE "hold any 'corporate' position in QD Trading," so as to give them any decisive control or veto over the initiation of litigation. *Id.*

These articulated positions reflect a sharp dispute over a potential bar to suit in *QD Trading*/ARE. It is complicated by the interface of Chinese and United States law, and a need to choose between them for governance. However, this dispute over corporate authority does not lack plausibility and colorability on the fact allegations made here. This challenge equally puts QD Trading's claims into bona fide dispute.

Again, and in conclusion: QD Trading's predicate claim was not only subject to bona dispute, it was actively and not inappropriately *in* bona fide dispute in pending litigation on objectively-cognizable grounds when the petition was filed to commence this case. QD Trading did not qualify under 11 U.S.C. § 303(b)(1) to subscribe to the petition as a creditor of ARE.

## 2. Charles Johnson

The Petitioners similarly insist that Charles Johnson's claim is not and cannot be subject to bona dispute. They do not do so with such fervor; and really, they could not.

First: Charles Johnson prevailed in conciliation court and got judgment against ARE, but that no longer bears on the existence of a dispute let alone one of bona fide character. The removal of Charles Johnson's claim to the Ramsey County District Court entitled ARE and Dion Johnson as defendants to a trial *de novo*. Minn. Gen. R. Prac. § 521(a) (2014). This put Charles Johnson's claim back into active suit, unresolved by any judicial determination. The record at bar does not reveal whether the order for judgment in conciliation court was formally vacated pursuant to Minn. Gen. R. Pract. § 521(d) (2014). However, Charles Johnson does not raise any issue on that procedural point, and it can be assumed that the conciliation court decision no longer has legal

effect.[32]

This brings the inquiry on bona fides to the parties' supplementary submissions for these motions.  Resort to such extrinsic materials is appropriate; the only pleading from the state court matter in the record at bar, Charles Johnson's hand-completed complaint in conciliation court, is bare of detail and lacks a legal dimension of any nuance.  So is the conciliation court's order for judgment.

Charles Johnson expands on his claim in an affidavit prepared for this case.  He asserts a right to receive sales commissions "that were due and owing to" him by ARE as of November 28, 2012, when "Dion Johnson transferred [his] position to a company called ARE Sales and Engineering."  Affidavit of Charles Johnson [within Dkt. No. 17], ¶¶ 2-6.[33]  He states that Dion Johnson "assured [him] that ARE Engineering was a related company and that [he] would be paid all of [his] commissions," with his "transfer to ARE Engineering [to] have no affect [sic] on [his] right to payment and receipt of commissions that were due and owing to [him] prior to the transfer."  *Id.*, ¶¶ 5-6.  He then asserts that the claim that he sued out against ARE was based on "commissions that [were] . . . earned and [payable] during the tenure of my employment of [sic] *either* [ARE] or ARE Engineering."  *Id.*, ¶ 7 (emphasis added).

In response, ARE cites the terms of a Commission Sales Agreement dated July 16, 2012, between it and Charles Johnson.  ARE's Statement of Position Regarding State Court Litigation [Dkt. No. 15], ¶ 3.[34]  It cites one of that agreement's terms as the relevant limitation on

---

[32]This pivotally distinguishes Charles Johnson's potential eligibility from that of the petitioning creditors in *In re Murrin*, 461 B.R. 763 (Bankr. D. Minn. 2012), *rev'd on other grounds*, 477 B.R. 99 (D. Minn. 2012).

[33]Charles Johnson identifies ARE Sales & Engineering as a "company [Dion Johnson] owned and which was set up to pursue sales in Central and South America."  *Id.*, ¶ 4.  As if to further confuse the nomenclature for these motions, the Petitioners use "ARE Engineering" as a tag for this entity in their submissions.  For consistency with the submitted record, that will be used in this decision for the treatment of Charles Johnson's claim.

[34]At this point Charles Johnson does not deny that he entered this agreement.

24

Charles Johnson's right to commissions:

> In order to qualify for commission and bonus payouts, you must be employed by ARE and remain in the Sales department.  Should you transfer to another department, resign from or be terminated by ARE for any reason, commissions will be paid on closed orders only, which is defined as orders where product has been delivered, accepted by the customer, and ARE has received full payment (excluding shipping and less charge backs).

Commission Sales Agreement, ¶ 9 (Exh. 2 to ARE's Statement of Position [Dkt. No. 15]).

For the motions at bar, ARE produced a recap of all sales that it attributed to Charles Johnson's effort "on closed orders only" that qualified as such before November 28, 2012.  Exh. 3 to ARE's Statement of Position [Dkt. No. 15].  It alleges that Charles Johnson received his commission on all of those closed transactions.  ARE's Statement of Position [Dkt. No. 15], 2. Finally, ARE was on record in mid-2013 that Charles Johnson "never signed the contract" for a substituted engagement with ARE Engineering, "nor commenced work in this department."  Hence, it has consistently maintained, Charles Johnson's employment "was terminated on November 28, 2012," and he was not entitled to receive commissions on the product orders for which he sued ARE in conciliation court--because "the orders . . . were either not closed prior to [his] termination or were never closed."  Letter of May 16, 2013 from Cristen C. Post, Esq. to Charles Johnson (Exh. 4 to ARE's Statement of Position [Dkt. No. 15]).

For the motions at bar, the Petitioners insisted that the "dispute over Charles Johnson's claims is not bona fide."  Petitioning Creditors' Memorandum [part of Dkt. No. 17], 21. The supporting argument for this pronouncement is shallow and circular; it borders on the incoherent.  The only argued legal support for Charles Johnson's claim on its merits is the pronouncement that ARE "apparently claims to enforce a contract that it had agreed to modify"--the thought here being that the asserted assurances from Dion Johnson overrode any bar under paragraph 9 of the Commission Sales Agreement.

The Petitioners' lawyer does not cite any authority under Minnesota law. The Petitioners do not acknowledge that the statute of frauds and the parol evidence rule, among others, might apply. These principles of generally-applicable contract law certainly present threshold issues that otherwise might bar any enforceable modification of the Commission Sales Agreement. The Petitioners do not offer any factual assertions to override them.

But regardless, there is a threshold defense under Minnesota case law that addresses situations closely-corollary to this one. It is well-recognized that a salesperson-employee's right to receive commissions after the termination of employment is governed--by statute and the terms of the contract of employment. *See* Minn. Stat. § 181.14, Subd. 1(a) and *Lapadat v. Clapp-Thomssen Co.*, 397 N.W.2d 606 (1986). The cited statute requires an employer, on termination of employment, to pay commissions "earned and accrued"; however, where the statute does not define the word "accrued" the "terms of a compensation plan govern" the meaning. *Friedenfeld v. Winthrop Resources Corp.*, 2003 WL 1908112, *3 (Minn. Ct. App. 2003) (unpublished) (citing *Holman v. CPT Corp.*, 457 N.W.2d 740, 743 (Minn. Ct. App. 1990), *review denied* (Minn. Sept. 20, 1990). Here, the Commission Sales Agreement at paragraph 9 is obviously directed toward that definition, to fill that gap.

Somewhere behind the parties' facial bluster over these issues, there may be a dispute over the timing of the delivery, acceptance, and payment on particular orders, against the date on which Charles Johnson's employment was terminated. If there were such a dispute, that would be precisely the point under this case law authority. Even if there were not, Charles Johnson's assertion of an enforceable modification, novation, or substitution to override paragraph 9 raises the statute of frauds, the parol evidence rule, or any other basis under the law of contract

to support such a rewrite.[35]  None of that has been adequately developed here as a matter of fact or law.  However, that does not mean that there is not a substantial dispute under the law that would apply to Charles Johnson's claim outside of bankruptcy.  Entirely to the contrary; a panoply of issues lines up behind Charles Johnson's conclusory assertion of a right to payment.[36]

The existence of a bona fide dispute over this claim is patent.  Charles Johnson did not even meet his initial burden, to prove a lack of dispute; but in any event ARE raises objectively-manifested, substantial factual and legal disputes over Charles Johnson's right to a recovery. *Rimell*, 946 F.2d at 1365.  Their existence disqualifies him as a petitioning creditor.

### 3.  Bestee Resources

Of the three parties that sought to have ARE put into bankruptcy, Bestee Resources presented the most baffling argument to qualify as a petitioner.

First:  the record itself raises a serious question as to the identity of the current real party in interest on these alleged transactions.[37]  The Petitioners do not account for the materially different form of name, as between the original transferor of the $550,000.00 (identified contemporaneously with the transfer as "Qingdao Industrial Bestee Company") and the party-signatory to the involuntary bankruptcy petition (named as "Bestee Resources Holdings Limited").  The difference in form of name is significant enough that it cannot be dismissed as a vagary of translation.  It implies that these are two different artificial business entities.  But if they are, the evidence points to only one of them as the company that would have made the loan asserted by the Petitioners--and that would not be the petitioner for this case.

---

[35]Among other things, Charles Johnson never articulates the nature, form, or value of any independent consideration for such a modification.  This would most likely be required even if the modification were rendered unenforceable by the statute of frauds or the parol evidence rule.

[36]Not unfairly, that assertion can be reduced to: "Dion Johnson told me, so ARE has to pay."

[37]ARE raised this point in its motion, though more in passing and by using different vocabulary. ARE's Supporting Memorandum [Dkt. No. 18], 19.

A past transfer between related companies of the rights on any associated claim might resolve this problem. However, the Petitioners do not even allege that such a transfer was made; and in any event they never documented such a transfer with the original petition as required by Fed. R. Bankr. P. 1003(a). So the Petitioners' own record raises a bona fide dispute over a threshold issue, whether Petitioner Bestee Resources is even the real party in interest on any predicate claim. Bestee Resources does not even acknowledge the confusion, let alone address it. This alone means that it did not meet its initial burden under *Rimell*, to "establish a prima facie case that no bona fide dispute exists" over its claim, i.e., a right to payment in its own right. 946 F.2d at 1365.[38]

But whatever the identity of the real party in interest, virtually nothing is settled about the consequences of the Bestee infusion of funds or the array of rights and liabilities in its wake. The Petitioners state that "[t]here is no meaningful dispute that Bestee transferred [the] $550,000.00 to" ARE. That seems to be correct, as a naked proposition. But a mere initial passage of money into ARE is only the starting point, given the indeterminacy of alleged circumstances both surrounding and subsequent.

The Petitioners insist that the "transaction had to be either a loan or a capital contribution." They summarily reject the latter on the lack of documentary memorialization: no extant subscription agreement; no corresponding written acknowledgment consistent with a capitalization; no ratification by documented board action; no issuance of a membership certificate; no tax documentation reflecting an associated shareholder or member status. For a

---

[38]More unresolved doubt arises from the international scope of the transactions in question. The status of successor-in-interest on any claim would likely be governed by Chinese law. Perhaps Chinese law allows an enforceable transfer of such rights between related entities without a formal assignment. But however Chinese law governs the question, the Petitioners--and in particular Bestee Resources--do nothing to resolve the ambiguity in pre-bankruptcy status. And this goes to the plane of law (because they failed to elicit the substance of governing Chinese law) as well as the predicate facts under that law. Without the clear chain of right that was Bestee Resources' burden to proffer, there is undeniable, facial uncertainty over its status as claimant and creditor; hence there is a bona fide dispute over the claim it asserts.

characterization as a loan, the Petitioners insist that "a trail of paperwork [exists] in which [ARE] specifically acknowledged the Bestee debt was owed and was to be repaid." Petitioning Creditors' Memorandum [part of Dkt. No. 17]**,** 20. They refer (without much documentary proffer) to this being in the form of bookkeeping entries; admissions in e-mail communications; and a later acknowledgment "in connection with a restructuring agreement at the shareholder level." *Id.* Thus, as the Petitioners would have it, the "objective evidence all clearly indicates that the Bestee claim is in fact a debt owed by the debtor and that it was never disputed." As the Petitioners would have it, ARE's current theory of resistance, that the Bestee infusion "should be recharacterized as something other than a debt," is "without legal or factual basis." *Id.*

ARE responds right in kind to this argument, asserting that the "amount transferred by Xiaohua and his company . . . was an investment in ARE" and not a loan. ARE's Supporting Memorandum [Dkt. No. 18], 18. ARE points to the lack of documents that would have memorialized a loan transaction and evidenced a debtor-creditor relationship. It emphasizes the Petitioners' inability then and now to quote customary sorts of terms for repayment (maturity date, collateral, interest rate, conditions of default, and enforcement remedies). ARE does acknowledge that "subsequent documents" exist that refer to the payment as a loan, apparently within its own internal bookkeeping. But it notes that the only communication-based evidence for a loan characterization was from Xiaohua, not from anyone on behalf of ARE or QD Engineering, and that this came after the fact. (Apparently, per ARE, this means it is self-serving and unworthy of reliance.) ARE's bottom line is that "none of [this] is definitive proof" to establish a cognizable *claim* out of the Bestee transfer, and not an *interest* in the ownership or membership of an entity. *Id.*

One could stop right there, on this array of successive positions, and a bona fide dispute over the nature and legal consequences of the Bestee infusion is obvious. Without any formal written memorialization pre-dating or accompanying the transfer, the evidence for a mutual, contemporaneous intent and consequent relationship comes down to he-said, he-said: a contest

29

between evidence that would be presented in testimonial form alone, with the eventual fact-finding

to be made on credibility both internal and external.  *See In re Conoryea*, 459 B.R. 384, 388 (Bankr.

D. Minn. 2011).

This would not make for a particularly easy dispute to resolve--even in the simplest

sense, as a comparison of the content of raw evidence.  After that, it would be necessary to

consider the possible legal limitations on the admissibility or probity of such evidence.  The bona

fide character of both levels of dispute is undeniable.  All of these issues are fair game for dispute;

and any such dispute must be resolved by the credibility and weight of the sides' testimonial

narratives and evidence.[39]

That makes enough of a bona fide dispute.  But there is another dimension for

dispute, not acknowledged by the parties.  In pitching their respective positions, both sides used

the dualism originally proposed by the Petitioners: loan versus capital investment.  Aspects of the

record suggest another possibility, as to what was happening through the Bestee infusion.

ARE's proffer, *see* p. 10, *supra*, suggests that almost all of the money went right

around through a circle of related entities, back to QD Industrial Bestee Company, very quickly after

the original disbursement to ARE.  The sequence looks like a conduit only; the record contains no

evidence of different contractually-structured relationships for the intermediate transfers.  Absent

such evidence, this loop of transfers might have brought about a satisfaction or nearly-complete

paydown of any original debt otherwise to be imputed to ARE.

Or, it could reflect something of a more ulterior motive.  Xiaohua, through his Bestee

entity or entities, could have been crafting the pretense of substantial startup funding for QD

Trading, while always intending a quick recovery of the money--protecting him and the Bestee entity

---

[39]It has to be observed: the failure of the Bestee-entity infuser to document the nature and application of its half-million dollars left it entirely vulnerable to challenge from ARE over all the consequences.

from the risk or financial exposure otherwise resulting from an actual, permanent placement of the funds into the ARE enterprise structure.[40]

This is entirely speculation, but the basic evidence in this case suggests such inferences as possibilities. ARE did not raise this as an alternate theory for disputing Bestee Resources' qualification as a petitioning creditor. Nonetheless, the mere possibility of this scenario as historical fact puts the underlying claim further into real, objective dispute.

For any of these three reasons, the claim asserted by Bestee Resources is in bona fide dispute. Bestee Resources cannot qualify as a petitioning creditor for this case.

## CONSEQUENCES

None of the three parties that joined in the original petition against ARE qualify to press the substantive issue under 11 U.S.C. § 303(h)(1).[41] Were those three parties the only petitioners at present, this case could end right at that point; for lack of *any* qualified proponents for bankruptcy relief, an effort to put ARE into liquidation under Chapter 7 against its will would have to end. *Basin Elec. Power Coop. v. Midwest Processing Co.*, 769 F.2d 483, 486-487 (8th Cir. 1985), *cert. denied*, 474 U.S. 1083 (1986) (where involuntary bankruptcy petition is filed by single claimant that does not qualify under § 303(b)(1), petition must be dismissed once court has determined petitioner's lack of qualification).

---

[40]The parties never broached any aspect of Chinese law that would have governed the establishment of the ARE-related entity structure in China. But it is not inconceivable that Chinese law would have mandated both the presence of Chinese ownership and substantial, Chinese-provided startup funding for any intermediate company that would not be subject to the VAT for its transacting toward the export of Chinese-produced goods to ARE. QD Trading obviously provided the entity for the ownership interest. The papered pretense of an infusion from Bestee would have matched to a funding requirement.

[41]This statute requires qualified petitioning creditors in an involuntary bankruptcy case to prove, as a prerequisite for the entry of an order for bankruptcy relief against the putative debtor, that

the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . .

However, one thread remains.  Just before the hearing on these motions but months after the contest between ARE and the three Petitioners was queued up, the Petitioners' counsel filed an "Amended Petition" [Dkt. No. 23] that purported to join Polaris Industries, LLC as a petitioner.  The basis of that entity's status was identified as a claim for "Unreturned Deposit," for an unfulfilled order of products, in the stated amount of $12,605.00.[42]  In oral argument, the Petitioners' counsel insisted that the "addition" of this party as a petitioner "was not to have substantive effect" for these cross-motions, and that his "intention in adding Polaris [was] not for today . . . ."

Nonetheless, with the failure of qualification for the original Petitioners it is appropriate to recognize the addition and to square off with it.  Simply stated, counsel's enlistment of this party does not save the petition after the fact, or allow this case to go forward as a vehicle to force ARE into liquidation.

An involuntary petition may be prosecuted by one qualifying creditor, but only if there are "fewer than 12 . . . holders" of claims against the putative debtor that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount. 11 U.S.C. § 303(b)(2).  In an offer of proof, ARE's Supporting Memorandum [Dkt. No. 18], n.12, ARE states that there are more than 12 such claimants against it.  If so, a petition under the prosecution of this sole surviving petitioner would have to fail.  11 U.S.C. § 303(b)(1) (establishing general rule, requiring three or more holders of qualifying claims to be petitioners in involuntary bankruptcy case); *Basin Elect. Power Coop. v. Midwest Processing Co.*, 769 F.2d at 486-487.

Counsel for both sides seemed to have contemplated further proceedings to get into that complex of issues, as to the variant statutory requirements for creditor numerosity.  However, it is not necessary to prolong the task of this case for that.  Even if ARE had less than 12 creditors,

---

[42]The addition was supported by an appended verification from Christopher Filos, identifying himself as the CEO of this party.

the debt held by this possible, surviving, *sole* petitioner would not meet the current floor for amount required by §§ 303(b)(1) - (2), $15,325.00.  Simply stated, the weight of the aggregated debt held by the only remaining party that would have ARE liquidated . . . is not sufficient.

There is no cognizable proponent for involuntary bankruptcy here.  The original Petitioners are not qualified to proceed or even to be heard any longer in support of pursuing it. The sole creditor joining post-petition has an insufficient stake in ARE's debt structure to allow it to proceed.  This case can not be maintained as an instrument to force ARE into liquidation.  For want of qualified petitioning parties, it must be dismissed now.  It is not warranted to require ARE to formally move for that disposition.

## OUTCOME

On the memorandum of decision just entered pursuant to Fed. R. Bankr. P. 1018 and Fed. R. Civ. P. 52(a)(1),

IT IS ADJUDGED AND ORDERED:

1.      The Petitioners' motion for partial summary judgment is denied.

2.      Putative debtor ARE's motion for partial summary judgment is granted.

3.      Qingdao ARE Wind Power Equipment Co., Ltd.; Bestee Resources Holdings, Limited.; and Charles Johnson did not qualify under 11 U.S.C. § 303(b)(1) to file a petition for bankruptcy relief against putative debtor ARE when they filed the petition that commenced this case on January 24, 2014.

4.      With the disqualification of those parties as petitioners, the joinder of Polaris Industries, LLC to the petition would not satisfy the debt threshold of 11 U.S.C. § 303(b)(2) to allow that party to maintain the petition even if putative debtor ARE had fewer than 12 creditors in all.

5.      For want of qualified petitioning creditors holding claims in a sufficient amount against putative debtor ARE, the petition, and this case as a whole, are dismissed.

6.      The dismissal under Term 5 shall not affect ARE's pending motion for imposition of sanctions against the Petitioners and their counsel, or any other right ARE may have under 11 U.S.C. § 303(i).

BY THE COURT:

*/e/ Gregory F. Kishel*

_____

GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE